UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------

TRADESHIFT, INC.,                                Case No.   1:20-cv-3661

               Plaintiff,

        -against-

SMUCKER SERVICES COMPANY,

           Defendant.                        DEMAND FOR JURY TRIAL

----------------------------------------------------

**<u>COMPLAINT</u>**

Plaintiff Tradeshift, Inc. ("Tradeshift" or "Plaintiff"), by and through its attorneys, for its Complaint against Defendant Smucker Services Company ("Smucker" or "Defendant"), alleges as follows:

## PARTIES

1.      Plaintiff Tradeshift is a Delaware corporation, and at all relevant times, has had its principal place of business in San Francisco, California.

2.      Plaintiff is informed and believes that Defendant Smucker is an Ohio corporation and, at all relevant times, has had its principal place of business in Orrville, Ohio.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this action is between a Plaintiff that is a citizen of Delaware and California, and a defendant that is a citizen of Ohio; and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over Smucker and venue is proper here through Smucker's consent.  As further alleged below, Tradeshift and Smucker entered into a contract (the "Smucker Services Agreement"), in which they agreed that "any proceeding between the Parties not subject to mediation or arbitration will take place in the Southern District of New York, which will be the exclusive venue for any such dispute."

## GENERAL ALLEGATIONS

5.      Founded in 2010, Tradeshift is a software company comprised of some 900 employees that provides a cloud-based business-to-business network and platform that transforms the way companies buy, pay, and work with suppliers.  Tradeshift's Software as a Service ("SaaS") products help business customers connect with all their suppliers digitally;

remove paper and manual processes across procure-to-pay; seize early payment discounts to save money; buy what they need faster; and manage supplier risk.

<u>The Smucker Services Agreement</u>

6.      On June 28, 2019, Tradeshift entered into an agreement entitled "Services Agreement" with Smucker (the "Smucker Services Agreement"), pursuant to which Tradeshift would provide Smucker with certain software on an annual subscription basis and certain services related to implementing and managing that software.  As part of the Smucker Services Agreement, Tradeshift agreed to, among other things, implement a procurement solution for Smucker using the Tradeshift Platform Business Edition solution and the Tradeshift Pay Business Edition solution.

7.      Another software provider, BuyerQuest, Inc. ("BuyerQuest") was identified as a "key subcontractor" to Tradeshift in the Smucker Services Agreement and its BuyerQuest Procurement Application was also part of the SaaS subscription services that Smucker contracted for with Tradeshift.  Under the Smucker Services Agreement, Smucker was responsible for paying Tradeshift only and had no direct payment obligations to BuyerQuest.  Instead, Tradeshift and BuyerQuest entered into separate agreements, including a reseller agreement, pursuant to which Tradeshift agreed to pay BuyerQuest a portion of the fees that Tradeshift received from Smucker.

8.      Under the Smucker Services Agreement, Smucker contracted to pay certain SaaS software subscription fees to Tradeshift for a period of five years.  Smucker also agreed to pay Tradeshift certain service fees for implementing the SaaS software and for managing the software thereafter.

9.      The Smucker Services Agreement contains specific provisions as to how the

agreement could be terminated.  Section 2 of the Smucker Services Agreement states that "Smucker may terminate this Agreement in the event that Service Provider is in material breach of any obligation under this Agreement and Service Provider does not cure its material breach of this Agreement within 30 days of receiving Smucker's Written Notice of the material breach."

10.     The Smucker Services Agreement also contains an integration clause, which specifically states the agreement "and any Service Schedules supersede all prior oral or written understandings, representations, negotiations, and correspondence between the parties."  That is, the parties' prior discussions and negotiations, including those in connection with the vendor selection process, were superseded by the Smucker Services Agreement.  The Smucker Services Agreement also states that (except as expressly stated in the Smucker Services Agreement), "Smucker has not relied on the future availability of any services, programs, or updates with respect to the SaaS solutions."

<u>Smucker Repudiates and Breaches the Smucker Services Agreement</u>

11.     Pursuant to the Smucker Services Agreement, Tradeshift and its subcontractor, BuyerQuest, began work on the Smucker project in July 2019.  They made substantial implementation progress and quickly completed several milestones.  Project progress continued apace into January 2020, when the parties were engaged in system and user acceptance testing in preparation for "going live" with the solution later that spring.

12.     As Tradeshift and BuyerQuest were working to complete user and acceptance testing, Smucker suddenly (and with no prior notice) repudiated the Smucker Services Agreement.  Specifically, Smucker sent a letter dated January 16, 2020 entitled "Notice of Termination," which stated that "Smucker is terminating the [Smucker Services Agreement], effective January 17, 2020."  Smucker stated that the basis for its purported termination was that

Tradeshift had allegedly made certain intentional and material misrepresentations about its product capabilities that rendered the agreement voidable.  Without identifying any specific alleged misrepresentations, Smucker claimed that Tradeshift "knew that these representations were false when made to Smucker" and that "Smucker would never have entered into the [Smucker Services] Agreement" had Tradeshift been accurate.

13.     The Notice of Termination advised that Tradeshift should "immediately cease access to and use of Smucker's systems, or to any Smucker Confidential Information provided in connection with the project."   In addition, Smucker said that it would "advise any Tradeshift personnel planning to travel to a Smucker facility [in the] next week that their onsite presence is not required" and that access to Smucker systems and facilities had been suspended.  Finally, Smucker noted that it had "advised [its] team not to have any further communication with Tradeshift personnel."

14.     The Smucker Notice of Termination took Tradeshift by surprise, both because Smucker had not previously told Tradeshift that it was considering terminating the contract and also because Smucker did not follow the termination provisions of the contract, including because it failed to provide notice of alleged material breaches and a cure period.  Prior to sending the Notice of Termination, Smucker did not provide Tradeshift with written notice of any alleged material breach or provide Tradeshift with an opportunity to cure such breaches as the contract required Smucker to do in order to terminate the contract.  On information and belief, Smucker terminated the Smucker Services Agreement because it intended to enter into a direct agreement with Tradeshift's subcontractor on the Smucker project, BuyerQuest.

15.     After receiving the Notice of Termination, Tradeshift promptly attempted to contact the Smucker team without success.  Tradeshift also attempted to contact BuyerQuest for

support in addressing Smucker's purported Notice of Termination but was rebuffed.  BuyerQuest

took the position that it had no further obligations to Tradeshift whatsoever owing to Smucker's

purported termination of the Smucker Services Agreement (however, BuyerQuest was not a

party to the Smucker Services Agreement).  Tradeshift and Smucker's legal counsel

subsequently exchanged a series of letters in which Tradeshift objected to the validity of

Smucker's termination and confirmed that it remained ready, willing, and able to perform its

contractual obligations.  In this correspondence, Tradeshift asked Smucker to identify any

alleged material breaches that it contended were the basis for its termination of the agreement.

In response, Smucker stated that it had not terminated the Smucker Services Agreement under

the termination provisions in the contract but, instead, claimed that the Smucker Services

Agreement had been rendered "voidable" at Smucker's option due to certain alleged

misrepresentations that Smucker contended Tradeshift had made.  Smucker asserted that it did

not have to comply with the contractual termination provisions requiring notice and a cure period

on account of the alleged misrepresentations.

        16.     Tradeshift responded that it did not materially misrepresent the capabilities of its

software and continued to dispute the validity of Smucker's termination.  However, neither

Smucker nor BuyerQuest would engage with Tradeshift on the project following Smucker's

Notice of Termination.  On information and belief, following (or at or around the time of) the

Notice of Termination, Smucker and BuyerQuest entered into a contract for the Smucker project

that was originally the subject of the Smucker Services Agreement. Tradeshift sued BuyerQuest

for breach of contract, breach of the implied covenant of good faith and fair dealing, and

intentional interference with contractual relations in February 2020.

## COUNT I:  BREACH OF CONTRACT

17.     Tradeshift incorporates by reference as if fully set forth herein each of its allegations set forth in the preceding paragraphs.

18.     The Smucker Services Agreement constitutes a valid and binding written contract.

19.     Tradeshift had materially fulfilled its obligations under the Smucker Services Agreement up to the date of the Notice of Termination and was ready and able to perform its future obligations under the Smucker Services Agreement at the time the Notice of Termination was received.

20.     The Smucker Services Agreement requires Smucker to pay Tradeshift certain annual subscription fees for software licenses over a period of four years and a one-time upfront payment for implementation services.  To date, however, Smucker has only paid a fraction of the implementation fees and none of the subscription fees owed to Tradeshift under the Smucker Services Agreement.

21.     Smucker materially breached the Smucker Services Agreement by failing to abide by the termination provisions and instead asserting in the Notice of Termination that the Smucker Services Agreement was void.  Smucker subsequently prevented Tradeshift from further performing its own obligations under the Smucker Services Agreement following the Notice of Termination.  Smucker further materially breached the Smucker Services Agreement by failing to pay Tradeshift for certain implementation services and for the license fees owed under the terms of the Smucker Services Agreement.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the acts complained of above, Tradeshift respectfully requests that the Court grant judgment as follows:

      a.   for compensatory damages in the amount of the license fees and remaining

implementation fees specified in the Smucker Services Agreement, or such other amount as determined to be owed;

b.  for pre- and post-judgment interest; and

c.  for such other and further relief as this Court may deem just and proper.

Dated: New York, New York
        May 11, 2020

                                        Respectfully submitted,

                                        Orrick, Herrington & Sutcliffe LLP


                                        By: */s/ Richard F. Martinelli*

                                        Richard F. Martinelli
                                        rmartinelli@orrick.com
                                        51 West 52nd Street
                                        New York, NY  10019-6142
                                        +1 212 506 5000

                                        Attorneys for Plaintiff
                                            Tradeshift, Inc.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:          May 11, 2020

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: <u>*/s/ Richard F. Martinelli*</u>

Richard F. Martinelli
rmartinelli@orrick.com
51 West 52nd Street
New York, NY  10019-6142
+1 212 506 5000

Attorneys for Plaintiff
   Tradeshift, Inc.