```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/29/2021
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRADESHIFT, INC.,

                    Plaintiff,

        – against –

SMUCKER SERVICES COMPANY,

                    Defendant.

**OPINION & ORDER GRANT-
ING MOTION TO DISMISS
COUNTERCLAIMS**

20-cv-3661 (MKV)

MARY KAY VYSKOCIL, United States District Judge:

        Tradeshift, Inc., a software company, brings this action against Smucker Services

Company, the nationally known manufacturer of jam, jelly, peanut butter, and other food

products, for breach of contract.  [ECF No. 1] ("Compl.").  Smucker answered and

brought counterclaims for fraudulent inducement, fraudulent misrepresentation, negligent

misrepresentation, and breach of contract.  Answer and Counterclaims [ECF No. 16]

("Countercl.").  Pending now before the Court is a motion by Tradeshift to dismiss

Smucker's counterclaims for fraudulent inducement, fraudulent misrepresentation, and

negligent misrepresentation, and to dismiss or strike Smucker's prayer for punitive

damages.  Pl.s' Motion to Dismiss, [ECF No. 30].[1]  For the reasons set forth below,

Tradeshift's motion is GRANTED in full.

## I.    FACTUAL BACKGROUND

        In deciding Tradeshift's motion to dismiss, the Court accepts all facts alleged in

Smucker's counterclaims as true and construes Smucker's answer and counterclaims in

the light most favorable to Smucker.  *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120,

128 (2d Cir 2011).

---

[1] In support of its Motion, Tradeshift filed a Memorandum of Law [ECF No. 31] ("Pl. Mem."), and a
declaration containing the agreement.  Declaration of Amy Van Zant ("Van Zant Decl."), Ex. A ("SSA"),
[ECF No. 32-1].  Defendant Smucker then filed an opposition.  [ECF No. 48] ("Def. Opp.").  Tradeshift
replied.  [ECF No. 51] ("Pl. Reply").

Smucker is an Ohio corporation that produces and sells consumer packaged goods, including jam, jelly, peanut butter, fruit syrups, beverages, and more, nationwide. Countercl. ¶¶ 2, 10-11.  To manage its business, Smucker works with hundreds of suppliers daily.  *Id.* ¶ 18.  In 2019, Smucker began a search for a new software vendor to provide a comprehensive system to manage its supply chain, including software that could manage its procure-to-pay process.  *Id*. ¶¶ 2-3, 16-17, 19.  Specifically, Smucker sought a software vendor that would allow it to perform most functions electronically, including supplying "master data management, creating and revising purchase requisitions, creating and revising purchase orders, entering goods receipts, invoice processing and reconciliation, and payments," with minimal manual intervention.  *Id*. ¶¶ 16-17.  As part of its search process, Smucker required prospective software vendors to complete a multi-step application process, including a written response to Smucker's Request for Proposal ("RFP"), completion of a Business Requirements Document ("BRD"), and an interview.  *Id.* ¶ 19.  Smucker does not state how many vendors were considered for the contract, but states that the search process was rigorous and that it interviewed several vendors.  *Id.* ¶¶ 3, 19.

Tradeshift was the winning contender for the Smucker contract.  Countercl. ¶ 5. Tradeshift is a software company that provides Software as a Service ("SaaS")[2] products to enable customers to manage their businesses with cloud-based business-to-business networks and platforms.  Compl. ¶ 5.  On March 2, 2019, Tradeshift submitted its RFP response to Smucker to enter the selection process, answering over 200 questions about its business, its experience, and the capabilities of its software products.  Countercl. ¶¶ 24-30.  Based on Tradeshift's proposal, Smucker selected Tradeshift as a finalist and asked it to complete the BRD.  *Id.* ¶ 31.  In the BRD, Smucker details its approximately

---

[2] While not explicitly defined by the parties, Tradeshift's SaaS products "help business customers connect with all their suppliers digitally; remove paper and manual processes across procure-to-pay; seize early payment discounts to save money; buy what they need faster; and manage supplier risk."  Compl. ¶ 5.

250 requirements for its software, including over 180 "must have[s]," without which any procure-to-pay software system would not work for Smucker.  *Id.* ¶¶ 31-34, 49.  On June 14, 2019, Tradeshift submitted its completed BRD, which represented that Tradeshift could meet most of Smucker's requirements.  *Id.* ¶ 31.  Specifically, Tradeshift represented that its software product had

> the ability to have one to many supplier site relationships; the ability for a user to 'hide' the overall [purchase order] value on a [purchase order] communication to the supplier; the ability to integrate supplier master date from Oracle in an automated manner; the ability to setup various approval routing rules (at entry of invoice); the ability to setup reconciliation routing rules; the ability to customize the entry form; the ability for all master data to be real-time; and, the ability to enter a credit memo for returns.  *Id.* ¶ 48.

Smucker ultimately selected Tradeshift as its software vendor, and on June 30, 2019, the parties entered into a contract that they called the Smucker Services Agreement ("SSA").  *Id.*  ¶ 5.

The SSA incorporated several exhibits, including a fee schedule, the SaaS schedule defining the functions of the product Tradeshift was to provide for Smucker, and a statement of work ("SOW") setting out the schedule and terms for implementation of the project.  As permitted by the SSA, Tradeshift then subcontracted with BuyerQuest, another software company, to execute certain subscription services outlined in the SSA.  SSA at 1; Compl. ¶ 7.  Per the SSA fee schedule, Smucker's subscription term for the SaaS product was to be for a period of five years.  SSA at 17.  The SSA provided it would remain in effect until all "services and deliverables [were] completed and delivered in a conforming manner."  SSA § 2(a).  The SSA provided in part that, in the event of material breach, either party might terminate the SSA if, after providing the other party with written notice of the material breach, the counter-party did not cure the breach.  SSA § 2(c)-(d).  The SSA also included a section on warranty and limitation on liability.  Section 8(d) of the SSA provides:

> Except for the warranties in Section 8(A) above, [Tradeshift] makes no additional warranties of any kind whether express, implied (either in fact or by operation of

> law), or statutory, as to the services, deliverables, or documentation.  [Tradeshift]
> expressly disclaims all implied warranties of merchantability or fitness for a
> particular purpose.  [Tradeshift] does not warrant that the services are error-free or
> that operation of the services will be uninterrupted or will always be available.

Section 8(g) then carves out an exception from the above stating that neither party's liability shall be limited for damages that result from, among other things, "gross negligence, willful misconduct, or fraudulent actions."  The SSA also included at § 19 an integration clause, which provides in relevant part:

> This Agreement and any Service Schedules supersede all prior oral or written
> understandings, representations, negotiations and correspondence between the
> Parties, constitute the entire agreement between them with respect to the matters
> described, and will not be modified or affected by any course of dealing, course of
> performance, or usage of trade.

Finally, under the terms of the SSA, the parties agreed that New York law would govern the contract and that any proceedings not subject to mediation or arbitration would take place in the Southern District of New York.  SSA § 14.

Soon after the parties executed the SSA and began working on the project problems began to surface.  Smucker identified several defects with the project, and implementation was delayed as Smucker had to provide Tradeshift with a list of software problems encountered on a weekly—and sometimes daily—basis.  Countercl. ¶¶ 39-41. Smucker alleges that it and Tradeshift had to meet near-daily to address the identified issues with respect to the project.  *Id.*  Smucker designated several of the problems as either "critical" or "fatal" defects, meaning that they would delay implementation of the software, or else that they would cause "system level errors" that completely stopped testing of the software.  *Id.* ¶¶ 42-44.  Some of the defects that Smucker encountered were the same "must have" requirements that Tradeshift had confirmed in the BRD that its software could meet.  *Id.* ¶¶ 45-47.  For example, Tradeshift's software could not provide real-time integration with Oracle, nor could its system "hide" the overall value of a purchase order on communications to suppliers, as Smucker had requested.  *Id.* ¶ 45, 64-65.

Faced with these defects, Tradeshift offered to address the problems through future upgrades or future releases of program software. *Id.* ¶¶ 52-53. Eventually, Tradeshift admitted that its software could not process credit memos or perform some of Smucker's other "must have" requirements. *Id.* ¶ 51. Despite weeks of attempted resolutions, the problems continued, and as of early January 2020, the program still had several defects. *Id.* ¶¶ 54-56. At the same time, "it also became apparent" to Smucker that Tradeshift's prior representations about the company's finances and experience were inaccurate. *Id.* ¶ 58.

On January 16, 2020,[3] Smucker voided the SSA. *Id.* ¶ 59. As of the date of filing its counterclaims, Smucker had paid Tradeshift $850,217.52 and had received invoices for an additional $232, 410.91. *Id.* ¶ 61. After voiding the SSA, Smucker selected a new vendor to replace Tradeshift—BuyerQuest, Tradeshift's former subcontractor. *Id.*; Compl. ¶ 16.

## II.   PROCEDURAL HISTORY

Within weeks of Smucker voiding the SSA, Tradeshift sued BuyerQuest for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional interference with contractual relations in an action in the Northern District of California. *See* Compl. ¶ 16. Thereafter Tradeshift commenced this action against Smucker. That same day, Smucker commenced a related action alleging fraudulent inducement, fraudulent and negligent misrepresentation, and breach of contract, 20 Civ. 3653. Subsequently, Smucker filed a notice of voluntary dismissal stating it would instead assert its claims as counterclaims in this action. 20 Civ. 3653, [ECF No. 14]. Smucker then filed its answer and asserted counterclaims against Tradeshift. *See* Countercl. In September 2020, Tradeshift moved under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Smucker's counterclaims for failure to state a

---

[3] Smucker's counterclaims provide this date as January 16, 2019. Countercl. ¶ 59. This appears to be a typographical error, as the SSA was not executed until June 30, 2019.

claim and moved under Rule 12(f) to strike Smucker's prayer for punitive damages. *See* Pl.'s Mot; Pl.'s Mem. This case was then reassigned to this Court on August 10, 2021.

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6) Motion to Dismiss

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Inter-Am. Dev. Bank v. IIG Trade Opportunities Fund N.V.*, No. 16 CIV. 9782 (PAE), 2017 WL 6025350, at *4 (S.D.N.Y. Dec. 4, 2017) (internal citations and quotations omitted). The Court must accept all factual allegations in the counterclaim as true and draw all reasonable inferences in the counterclaimant's favor when considering dismissal under Rule 12(b)(6). *See Wilson*, 671 F.3d at 128. However, the court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question in evaluating a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the

formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of plaintiffs' claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d 150, 155 (2d Cir. 2006)). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated into it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks and citations omitted).

### B.  Heightened Pleading Standard under Rule 9(b)

Beyond the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud with particularity. *See*, *e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)). Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *DiMuro v. Clinique Labs., LLC*, 572 F. App'x. 27, 30 (2d Cir. 2014) (quoting Mills *v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *See U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014).

The heightened particularity requirement of Rule 9(b) does not apply to allegations regarding fraudulent intent, also known as scienter, which may be alleged generally. *See Iqbal*, 556 U.S. at 686. However, plaintiffs "are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x. 618, 622 (2d Cir. 2012) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). "An inference is 'strong' if it is

'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Loreley Financing (Jersey) No. 3. Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007)).  Plaintiffs may assert a strong inference of fraudulent intent by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (citation omitted); *see also, e.g., Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 574 (S.D.N.Y. 2012).

### C.  Motion to Strike

"The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). In general, "motions to strike are disfavored." *Ambac Assur. Corp. v. EMC Mortg. Corp.*, No. 08 Civ. 9464 (RMB) (MHD), 2009 WL 734073, at *1 (S.D.N.Y. Mar. 16, 2009) (quoting *Roe v. City of N.Y.*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)).  "Where a demand for damages is not recoverable as a matter of law, however, it may be stricken." *Phila. Stock Exch. v. Int'l Sec. Exch., Inc.*, No. 05 Civ. 5390, 2005 WL 2923519, at *1 (S.D.N.Y. Nov. 2, 2005).  The Court will "deem the non-moving party's well-pleaded facts to be admitted, draw all reasonable inferences in the pleader's favor, and resolve all doubts in favor of denying the motion to strike." *Diesel Props S.r.L. v. Greystone Bus. Credit II LLC,* No. 07 Civ. 9580, 2008 WL 4833001, at *4 (S.D.N.Y. Nov. 5, 2008); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

## IV.  DISCUSSION

### A.  Fraudulent Misrepresentation and Fraudulent Inducement

Under New York law, claims for fraudulent misrepresentation and fraudulent inducement require a plaintiff to prove:  (1) a material misrepresentation or omission of fact, (2) made by the defendant with knowledge of its falsity (3) and an intent to defraud;

(4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011); *Crigger v. Fahnestock & Co*, 443 F.3d 230, 234 (2d Cir. 2006).  "[A]n actionable claim for fraudulent inducement must allege the 'representation of present fact, not of future intent.'" *320 W. 115 Realty LLC, All Bldg. Constr. Corp.*, 194 A.D.3d 511, 149 N.Y.S. 3d 28, 29 (1st Dep't 2021) (quoting *Deerfield Comm'n Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986)); *Bruce v. Martin*, No. 87 Civ. 7737 (RWS), 1993 WL 148904, at *5 (S.D.N.Y. Apr. 30, 1993).  Furthermore, "the Complaint must state with particularity the circumstances of the fraud under Rule 9(b) and contain sufficient facts, accepted as true, to state claims for relief for common-law fraud that are facially plausible under Rule 8(a)(2)."  *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 516 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).  Under the enhanced pleading standards of Rule 9(b), plaintiffs "must not only allege that the content is false, but 'they must demonstrate with specificity why and how that is so.'" *Travelex Currency Servs., Inc. v. Puente Enterprises, Inc.*, 449 F. Supp. 3d 385, 395 (S.D.N.Y. 2020) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

Tradeshift contends that Smucker has not adequately pled its claims for fraudulent misrepresentation and fraudulent inducement with the specificity required under Rule 9(b).  Pl.'s Mem. at 9-13.  The Court agrees.

In its counterclaims, Smucker alleges two general categories of misrepresentations by Tradeshift:  *First*, that in its response to the RFP, and in other communications between the parties before Smucker selected Tradeshift as its vendor, Tradeshift misrepresented its experience, expertise, financial health, and the quality of its product.  *See* Counrtcl. ¶ 4.  *Second*, that in its proposal and BRD, Tradeshift misrepresented its product's abilities to meet Smucker's specific requirements.  Countercl. ¶¶ 26-29, 45, 48.  According to Smucker, Tradeshift's proposal, BRD, and other communications prior to entering into the SSA, were "replete with material misrepresentations," and Smucker relied

on these misrepresentations when it selected Tradeshift as its software vendor. *Id.* ¶¶ 4-6, 36-38. Because Tradeshift's proposal and BRD are incorporated by reference throughout Smucker's counterclaims, the Court may consider the representations in these documents in deciding the Tradeshift's motion. *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) ("When presented with a motion to dismiss pursuant to Rule 12(b)(6), the court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken."); *see also Chambers*, 282 F.3d at 153.

### 1. Material Misrepresentation

To state a claim for fraud or negligent misrepresentation, plaintiff must allege the misrepresentation of a material fact. *Held v. Kaufman*, 91 N.Y.2d 425, 431 (1998); *CAC Group Inc. v. Maxim Group LLC*, 523 F. App'x 802, 804 (2d Cir. 2013). "Representations constituting 'mere opinion' are 'not actionable representations of fact.'" *Wolfson v. Wolfson*, No. 03 Civ. 0954 (RCC), 2004 WL 224508, at *7 (S.D.N.Y. Feb. 5, 2004) (citing *Greenberg v. Chrust*, 282 F.Supp.2d 112, 120 (S.D.N.Y. 2003)).

In its counterclaims, Smucker asserts that Tradeshift "made a number of material representations regarding its qualifications and capabilities." Countercl. ¶ 9. Smucker argues that its counterclaims, and the proposal and BRD incorporated therein, satisfy Rule 9(b)'s requirements to specify the fraudulent statements, the speaker, where and when the statements were made, and why the statements were fraudulent: *See* Opp. at 12. Smucker provides samples of some of Tradeshift's representations, and additionally alleges that the representations Tradeshift made that it would immediately be able to its product was "already designed to meet Smucker's" project requirements. Countercl. ¶¶ 25-31, 35-57. "[C]ourts have allowed plaintiffs to plead a complex and lengthy fraudulent scheme by pleading the scheme with particularity and providing a few 'representative examples,' as opposed to requiring recitation of the details of every instance where

the scheme has been used." *DiCicco v. PVH Corp.*, No. 19 CIV. 11092 (ER), 2020 WL

5237250, at *4 (S.D.N.Y. Sept. 2, 2020) (quoting *U.S. v. Wells Fargo Bank, N.A.*, 972 F.

Supp. 2d 593, 616 (S.D.N.Y. 2013)). Here, Smucker has explained how the "sampling of

some of the representations" that it cites are representative of Tradeshift's attempt to de-

fraud Smucker. *See* Countercl. ¶ 25. In particular, Smucker alleges that

> [i]t also became apparent to Smucker that Tradeshift had not worked with 20 similar companies on similar projects, its revenue in 2018 was not $300-$500 million, its financial position was brittle despite claims of ample funding in May 2018, and its product was not superior to that of its competitors and was woefully inadequate for the needs of Smucker.

Countercl. ¶ 58. In this way, Smucker directly alleges with particularity that Tradeshifts

prior representations, which were "material considerations leading Smucker to select

Tradeshift and enter into the Services Agreement," were fraudulent. Countercl. ¶ 37.

Smucker further proffers a list of examples of misrepresentations Tradeshift made with

respect to its product's capabilities and ability to meet Smucker's requirements. Coun-

tercl. ¶ 48. Smucker includes eight examples of its software requirements that Tradeshift

had represented it could meet, and specifically alleges that at least three of these were

false—that Tradeshift's software could provide integration with Oracle, hide the value of

a purchase order, and process credit memos. *Id.* ¶¶ 45, 51. When Smucker confronted

Tradeshift with these defects, Tradeshift "admitted" that the programs could not perform

these requirements, and responded that the issues could be addressed "in a future release

of the program software." Countercl. ¶¶ 50-52. Eventually, Tradeshift admitted that its

software could not process credit memos or perform some of Smucker's other "must

have" requirements. *Id.* ¶ 51. Smucker further confirms that it knows the representations

were false because Tradeshift's software has not, and cannot, meet the "basic functional-

ity" needed for the project. *Id.* ¶ 54. In sum, Smucker pleads facts establishing material

misrepresentation on the part of Tradeshift, and therefore meets its burden under Rule 9(b) to allege fraud.[4]  *See Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004)

    *2.  Knowledge of Falsity and Intent to Defraud*

Smucker has not sufficiently alleged knowledge of falsity and intent to defraud on the part of Tradeshift.  While the requirements to allege state of mind or intent with specificity are relaxed under Rule 9(b), "plaintiffs must [still] allege facts that give rise to a strong inference of fraudulent intent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-291 (2d Cir. 2006) (internal citations omitted).  A plaintiff can meet this burden by alleging either "motive and opportunity" to defraud or "strong circumstantial evidence" of an intent to defraud.  *Id.* at 290.

Smucker has failed to sufficiently allege either "motive and opportunity" or strong circumstantial evidence of intent to defraud.  To show motive and opportunity, Smucker would have to allege that Tradeshift "benefitted in some concrete and personal way from the purported fraud."  *Saltz v. First Frontier, LP,* 782 F. Supp.2d 61, 72 (S.D.N.Y. 2010) (citation omitted).  Smucker has not done so.  Though Smucker details that the representations made by Tradeshift led Smucker to select Tradeshift as the successful bidder for the project, Countercl. ¶ 37, Smucker never explains how Tradeshift knew that the representations were false when made, or explain for what purpose Tradeshift would make them.  Smucker merely states in conclusory fashion that "Tradeshift knew, or should have known, that its representations were false."  Countercl. ¶ 77.  Such statements are insufficient.  *See Shileds v. Citytrust Bancorp, Inc.*, 25 F.3d

---

[4] In its opposition, Smucker cites the pleading requirements for fraud under New York law, N.Y. C.P.L.R. § 3016(b), and argues that the New York Court of Appeals has stated that the specificity requirement "should not be so strictly interpreted as to prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting a fraud."  *Pludeman v. N. Leasing Sys., Inc.*, 10 N.Y.3d 486, 491 (2008) (internal citations omitted).  However, the applicable pleading rule in this case is Federal Rule of Civil Procedure 9(b), not New York Civil Practice Law and Rule § 3016(b). "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

1124, 1128 (2d Cir. 1994) ("[T]he relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."); *Petedge, Inc. v. Garg*, 234 F. Supp. 3d 477, 495 (S.D.N.Y. 2017) (stating "knew or should have known" insufficiently conclusory in fraudulent inducement claim).  To the extent that Smucker relies on its allegations that Tradeshift earned fees via the contract, *see* Countercl. ¶ 61, "a general profit motive, such as the motive to earn fees, is not sufficient motive to commit fraud."  *Prickett v. New York Life Ins. Co.*, 896 F. Supp. 2d 236, 246 (S.D.N.Y. 2012) (citing *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)); *Brookhaven Town Conservative Comm. v. Walsh*, 258 F. Supp. 3d 277, 286 (E.D.N.Y. 2017 ("Indeed, a generalized profit motive that could be imputed to any company . . . has been consistently rejected as a basis for inferring fraudulent intent."); *Wells Fargo Bank Northwest N.A. v. Taca Int'l Airlines*, 247 F. Supp. 2d 352, 365 (S.D.N.Y. 2002)  Nor does Smucker offer any evidence, circumstantial or otherwise, of an intent by Tradeshift to deceive Smucker.

3. *Reliance*

The question of a party's reasonable reliance is "intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss," *Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at *7 (S.D.N.Y. July 31, 2003).  However, the question of whether a party has "adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss."  *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999).  Claimants alleging reasonable reliance must plead that they actually relied on the alleged misrepresentations, specifically that the misrepresentation was a "substantial factor" in their decision.  *Travelex Currency Servs., Inc. v. Puente Enterprises, Inc.*, 449 F. Supp. 3d 385, 399 (S.D.N.Y. 2020) (citing *Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 283 (S.D.N.Y. 2019)).

In its counterclaims, Smucker alleges that it selected Tradeshift as the vendor for its software project based on Tradeshift's representations about its experience and its

product's ability to meet Smucker's specifications.  Countercl. ¶¶ 5-6, 36-38, 67, 70, 75, 79, 85.  Tradeshift argues that Smucker has not adequately alleged reliance on Tradeshift's representations, given the integration clause in Section 19 of the SSA which provides that the parties' agreement "supersede[s] all prior oral or written . . . representations."  Pl.'s Mem. at 14-15.  Smucker counters that the general language of the integration clause is insufficient to bar its claims for fraudulent inducement.  Opp'n at 16-18.

Whether an integration or merger clause in a contract suffices to defeat a party's reliance on representations made during the process leading up to the contract depends on the specificity of the clause disclaiming those representations.  In general, a general merger clause or integration clause "is ineffective . . . to preclude parole evidence that a party was induced to enter the contract by means of fraud."  *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993); *Hobart v. Schuler*, 55 N.Y.2d 1023, 1024 (1982); *Barnaba Realty Group, LLC v. Solomon*, 121 A.D.3d 730, 994 N.Y.S.2d 356, 358 (2d Dep't 2014).  Therefore, under New York law, even "when a contract contains an 'omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made,'" a party may assert fraudulent inducement to enter the contract.  *Mfrs. Hanover Trust Co.*, 7 F.3d at 315 (quoting *Danann Realty Corp. v. Harris*, 5 N.Y. 2d 317, 320 (1959)); *see also Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 575 (2d Cir. 2005).

However, an exception to this rule exists where "the contract states that a contracting party disclaims the existence of or reliance upon specific representations."  *Mfrs. Hanover Trust Co.*, 7. F3d at 315.  In that case, the party "will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations."  *Id.* The language of the merger or disclaimer clause is sufficiently specific where the "substance of the disclaimer provision tracks the substance of the alleged misrepresentations."  *Grumman Allied Indus., Inc. v. Rohr Indus,  Inc.*, 748 F.2d 729, 735 (2d Cir. 1984); *see*

*also Harsco Corp. v. Segui*, 91 F.3d 337, 345-46 (affirming dismissal of claims where plaintiff pled reliance on representations disclaimed in a section of the contract).

The integration clause in the SSA states only that "[t]his Agreement and any Service Schedules supersede all prior oral or written understandings, representations, negotiations and correspondence between the Parties" and "constitute the entire agreement between them with respect to the matters described." SSA § 19.  This clause on its own is "quite similar to the 'subject matter of the agreement' language that courts regularly deem too general and vague" to preclude a fraud claim such as that brought by Smucker. *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 489 (S.D.N.Y. 2017); *see also CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, No. 14-civ-3600 (VEC), 2014 WL 6674480, at *4 (S.D.N.Y. Nov. 25, 2014) (clause providing that contract "supersede[s] all prior agreements and understandings, both written and oral, between the Parties with respect to the Transactions" was too general); *Chase v. Columbia Nat'l Corp.*, 832 F.Supp. 654, 662 (S.D.N.Y. 1993) (clause providing that contract "supersedes all prior agreements and understandings between the parties relating to the subject matter of this Agreement" was too general).  Because the general integration clause in the SSA does not say that Smucker could not or should not rely on the representations made, it does not preclude Smucker from pleading reasonable reliance on the specific representations made by Tradeshift. *CCM Rochester, Inc.*, 2014 WL 6674480, at *4.

As discussed, Smucker has not sufficiently alleged knowledge of falsity or intent to defraud Tradeshift, and therefore its counterclaims for fraudulent inducement and fraudulent misrepresentation fail as a matter of law.  And because Smucker has not sufficiently alleged its claims with the particularity required by Rule 9(b), the Court need not determine whether or to what extent Smucker's fraud claims are duplicative of its breach of contract claim, which is not the subject of the motion to dismiss and therefore survives at this stage.  Pl.'s Mem. at 19-21.  Smucker is granted leave to amend, if desired, to plead its counterclaims for fraudulent inducement and fraudulent misrepresentation.

### B. Negligent Misrepresentation

Under New York law, a claim for negligent misrepresentation must allege "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *J.AO. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007). "A special relationship may be established by 'persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996)). In *Kimmell*, the New York Court of Appeals held that the existence of a special relationship is an issue of fact and is to be decided by weighing of three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2008) (quoting *Kimmell*, 89 N.Y.2d at 264). A defendant's "superior knowledge of the particulars of its own business practice is insufficient" to establish a special relationship, and "[g]enerally, a special relationship does not arise out of an ordinary arm's length business transaction between two parties." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 928 N.Y.S. 2d 229, 235-36 (1st Dep't 2011)). However, "'[c]ourts have found a special relationship and duty, for example, where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information.'" *Id.* (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258 (SAS), 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004)).

In addition to these substantive requirements, the heightened pleading requirements of Rule 9(b) apply to Smucker's claims for negligent misrepresentation just as they do to its claims for fraudulent inducement and misrepresentation.  *See Woori Bank v. RBS Sec.*, *Inc.*, 910 F. Supp. 2d 697, 705 (S.D.N.Y. 2012) (citing *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 200 (S.D.N.Y. 2011)). Here, as in *Woori*, Smucker incorporates each allegation of prior counterclaims into its counterclaim for negligent misrepresentation.  Countercl. ¶ 81; *Woori Bank*, 910 F. Supp. 2d at 705; *see also In re Parmalat Secs. Litig.*, 479 F. Supp. 2d 332, 339 n. 30 (S.D.N.Y. 2007).

While Smucker now argues that "there can be no question the parties had a special relationship," Opp'n at 21, it did not plead such a special relationship in its counterclaims.  Furthermore, Smucker's reliance on *Suez Equity Investors*, 250 F.3d at 105, is misplaced.  In *Suez*, defendants "initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." *Id.*  Here, Smucker solicited proposals from several different potential vendors, including Tradeshift.  Countercl. ¶¶ 3, 19, 22. Tradeshift, along with the several other potential vendors, completed the standard documents requested by Smucker. *Id.* ¶ 19.  Only then did Smucker chose Tradeshift over the other companies. *Id.* ¶ 5.  The precontractual relationship between Tradeshift and Smucker hews closer to an arms-length business transaction than to any special relationship.  The fact that Tradeshift, of course, had more insight into the experience and financial health of its own company than did Smucker does not indicate that the parties had a sufficiently special relationship to support a claim for negligent misrepresentation. *See Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 706-07 (S.D.N.Y. 2012) ("It is important to keep in mind that there is no requirement that there be information parity between counterparties in commercial transactions such as this.") (internal quotation marks and citations omitted).  Therefore, since "the law of negligent misrepresentation

17

requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified," *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003), Smucker has not made out a claim for negligent misrepresentation.  Smucker's counterclaim for negligent misrepresentation must therefore be dismissed.

### C.  Punitive Damages Are Not A Legally Available Remedy

"[U]nder New York law, punitive damages are not a separate cause of action," but instead are "inextricably linked to the underlying cause of action." *Greenbaum v. Svenska Handelsbanken, N.Y.*, 979 F. Supp. 973, 982 (S.D.N.Y. 1997), *on reconsideration sub nom. Greenbaum v. Handelsbanken*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998).  The purpose beyond punitive damages is "not to compensate the injured party but rather to punish the tortfeasor and to deter this wrongdoer and others similarly situated" from such future conduct.  *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007).  Punitive damages are "refused in the 'ordinary' fraud and deceit case." *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961).

The New York Court of Appeals has held that, in order to recover punitive damages for breach of contract involving fraud, a plaintiff must establish that a defendant's conduct:  (1) is actionable as an independent tort; (2) was sufficiently egregious; and (3) was directed not only against the plaintiff, but was part of a pattern of behavior aimed at the public generally.  *Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613 (1994); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000).  Many courts in this Circuit have held that *Rocanova* applies to fraudulent inducement claims stemming from a contractual relationship, including claims alleging fraud preceding the execution of the contract.  *Tianbo Huang v. iTV Media, Inc.*, 79 F. Supp. 3d 458, 462 (E.D.N.Y. 2015); *Mayline Enters., Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 311-12 (S.D.N.Y. 2009); *Merrill Lynch Co., Inc. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 423 (S.D.N.Y. 2003).  The New York Court of Appeals later

intimated that "[w]here a lawsuit has its genesis in the contractual relationship between the parties," the *Rocanova* requirements apply." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995)); *Schonfeld*, 218 F.3d at 184.

Tradeshift requests that Smucker's request for punitive damages be stricken because the conduct underlying its fraud-based counterclaims was not directed at the public and was not criminal. Pl.'s Mem. at 25. Smucker argues that Tradeshift misstates the standard for punitive damages under New York law and that the public wrong requirement does not apply here. Smucker's argument relies on *Borkowski v. Borkowski*, 39 N.Y.2d 982, 983 (1976) ("It is not essential . . . that punitive damages be allowed in a fraud case only where the acts had been aimed at the public generally") and on two cases from courts in this Circuit, *Langenberg v. Sofair*, No. 03 Civ. 8339 (KM) (KFM), 2006 WL 3518197, at *4 (S.D.N.Y. Dec. 7, 2006) and *Plymouth Res., LLC v. Norse Energy Corp. USA*, No. 32010 Civ 909 NAM DEP, 2011 WL 13234819, at *6 (N.D.N.Y. Mar. 10, 2011). However, *Borkowski* is a one sentence memorandum decision which predates the New York Court of Appeals decision in *Rocanova*, has never been cited by the New York Court of Appeals, *see Levi v. Commonwealth Land Title Ins. Co.*, No. 09 Civ. 8012 SHS, 2013 WL 5708402, at *10 (S.D.N.Y. Oct. 21, 2013), and represents a departure from the general rule in this Circuit, which requires fraud directed at the general public in order to merit punitive damages. *Levi*, at *10; *Mayline Enterprises, Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 311 (S.D.N.Y. 2009); *United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996); *Ventus Networks, LLC v. Answerthink, Inc.*, No. 05 Civ 10316, 2007 WL 582736, at *3 (S.D.N.Y. Feb. 22, 2007); *Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 270 (E.D.N.Y. 2013), *amended* (Mar. 23, 2013); *Tianbo Huang v. iTV Media, Inc.*, 79 F. Supp. 3d 458, 465 (E.D.N.Y. 2015).

Furthermore, both *Langenberg* and *Plymouth*, Plaintiff's other two authorities are distinguishable from the facts here, and in those cases, the courts in fact did find that plaintiffs had sufficiently alleged fraud directed at the public. *See Langenberg*, 2006 WL

3518197, at *5 (finding that defendant's numerous false filings with the Securities and Exchange Commission and creation of false promotional materials satisfied the public wrong requirement); *Plymouth Res.*, 2011 WL 13234819, at *7 (finding that defendant's conduct directed at other landowners and at the New York State Department of Environmental Conservation satisfied the public wrong requirement).

Contrary to Smucker's argument, Opp'n at 24, its bare allegation that "Tradeshift represented and publicly disclosed that it received at least $250 million in Series E funding in May 2018," Countercl. ¶ 29, does not constitute "predatory conduct toward the public at large," Opp'n at 24, so as to meet the *Rocanova* requirement of a pattern of behavior directed at the public generally.  Furthermore, even assuming that a showing of behavior directed at the public were not required, Smucker has failed to meet the other two *Rocanova* requirements.  Specifically, since there is no independent tort, Smucker has not sufficiently alleged a claim for fraudulent inducement or fraudulent misrepresentation.  Nor has Smucker alleged facts showing that Tradeshift's conduct was sufficiently egregious to merit punitive damages.  "To establish that a defendant's fraudulent conduct was sufficiently egregious and morally culpable to satisfy the second element, a plaintiff must allege facts that evince a 'high degree of moral turpitude' or 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'"  *Ventus*, 2007 WL 582736, at *3 (quoting *Rocanova*, 83 N.Y.2d at 613).  Smucker has not done so here, even assuming its allegations against Tradeshift to be true.  Thus, while a motion to strike is generally disfavored at the pleading stage, in this case striking Smucker's prayer for punitive damages is warranted.  *See Rosa v. TCC Commc'ns, Inc.*, No. 15 Civ.1665, 2016 WL 67729 (S.D.N.Y. Jan. 5, 2016) (striking punitive damages where plaintiff cannot establish necessary element).

## V.    CONCLUSION

For the reasons set forth above, Tradeshift's motion to dismiss Smucker's fraud-based claims and to dismiss Smucker's prayer for punitive damages is GRANTED

without prejudice.  Smucker is granted leave to replead.  If Smucker wishes to amend its counterclaims, it may do so by October 29, 2021.  Tradeshift's motion for oral argument is DENIED as moot.

The Clerk of Court respectfully is directed to terminate the motions, docket numbers 30 and 52.

SO ORDERED.

Dated:   September 29, 2021
         New York, New York

_____
Mary Kay Vyskocil, U.S.D.J.