## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRADESHIFT, INC., | ) CASE NO. 1:20-cv-03661-ER |
| | ) |
| Plaintiff and Counter | ) |
| Defendant, | ) |
| | ) |
| v. | ) |
| | ) **DEFENDANT AND COUNTER** |
| SMUCKER SERVICES COMPANY, | ) **PLAINTIFF SMUCKER SERVICES** |
| | ) **COMPANY'S ANSWER TO** |
| Defendant and Counter | ) **PLAINTIFF'S COMPLAINT AND** |
| Plaintiff. | ) **AMENDED COUNTERCLAIM** |

Defendant and Counter Plaintiff Smucker Services Company ("Smucker"), by and through counsel, and for its Answer to Tradeshift, Inc.'s ("Tradeshift") Complaint and Amended Counterclaim, states as follows:

### PARTIES

1.      Upon information and belief, Smucker admits the allegations in Paragraph 1 of the Complaint.

2.      Smucker admits the allegations in Paragraph 2 of the Complaint.

### JURISDICTION AND VENUE

3.      The allegations in Paragraph 3 are legal conclusions to which no response is required. To the extent a response is required, Smucker admits the allegations in Paragraph 3.

4.      The allegations in Paragraph 4 are legal conclusions to which no response is required. To the extent a response is required, Smucker admits the allegations in Paragraph 4.

### GENERAL ALLEGATIONS

5.      Smucker is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the Complaint and, therefore, denies the same.

6.      In response to the allegations in Paragraph 6, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019, and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

7.      In response to the allegations in Paragraph 7, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019, and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same. Further responding to the allegations, Smucker is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 of the Complaint and, therefore, denies the same.

8.      In response to the allegations in Paragraph 8, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019, and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

9.      In response to the allegations in Paragraph 9, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019, and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

10.     In response to the allegations in Paragraph 10, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019, and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

11.     In response to the allegations in Paragraph 11, Smucker admits that Tradeshift began performance under the Services Agreement but denies the remaining allegations as drafted.

12.     In response to the allegations in Paragraph 12, Smucker states that its January 16, 2020 correspondence is the best evidence of its terms and denies any inconsistent characterizations of same.

13.     In response to the allegations in Paragraph 13, Smucker states that its January 16, 2020 correspondence is the best evidence of its terms and denies any inconsistent characterizations of same.

14.     In response to the allegations in Paragraph 14 of the Complaint regarding Tradeshift's response, Smucker is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies the same. Smucker denies the remaining allegations in Paragraph 14 of the Complaint.

15.     In response to the allegations in Paragraph 15, Smucker states that to the extent it purports to summarize confidential settlement communications between the parties, that is a breach of the confidential nature of those proceedings. As a result, Smucker denies the allegations in Paragraph 15 as alleged.

16.     In response to the allegations in Paragraph 16, Smucker states that to the extent it purports to summarize confidential settlement communications between the parties, that is a breach of the confidential nature of those proceedings. As a result, Smucker denies the allegations in Paragraph 16 as alleged.

## COUNT I: BREACH OF CONTRACT

17.     Smucker incorporates its responses to each and every allegation in this Paragraph as if fully set forth herein.

18.     Paragraph 18 states a legal conclusion to which no response is required. To the extent a response is required, Smucker admits the allegations on Paragraph 18.

19.     Smucker denies the allegations in Paragraph 19 of the Complaint.

20.     In response to the allegations in Paragraph 20, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019, as that agreement is the best evidence of its terms and it denies any inconsistent characterizations of same.

21.     Smucker denies the allegations in Paragraph 21 of the Complaint.

## GENERAL DENIAL

22.     Each and every allegation and request for relief not specifically admitted herein is denied.

## FIRST AFFIRMATIVE DEFENSE

23.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

24.     Plaintiff's alleged damages, if any, were caused in whole or in part by the acts or omissions of Plaintiff.

## THIRD AFFIRMATIVE DEFENSE

25.     The claims are barred in whole or in part, by Plaintiff's failure to mitigate its damages, if any.

## FOURTH AFFIRMATIVE DEFENSE

26.     Plaintiff's claims are barred, in whole or in part, by the applicable doctrines of waiver, laches, unclean hands, accord and satisfaction, and/or administrative or equitable estoppel.

## FIFTH AFFIRMATIVE DEFENSE

27.     Plaintiff's claims are barred because there is no causation or connection between the alleged breaches and any alleged economic losses or damages, as well as being barred because any alleged causation or connection between the alleged breaches and any alleged damages is not attributable to Smucker.

## SIXTH AFFIRMATIVE DEFENSE

28.     Plaintiff's claims for losses or damages (if there are any losses or damages, which there are not) would improperly constitute unjust enrichment, and/or must be reduced by any setoff, offset, recoupment, or other provisions applicable for the reduction of amounts owed.

## SEVENTH AFFIRMATIVE DEFENSE

29.     Plaintiff's claims are barred by Tradeshift's own breaches of contract and fraud, as set forth in Smucker's Counterclaims and incorporated by reference as if rewritten herein.

## EIGHTH AFFIRMATIVE DEFENSE

30.     Smucker hereby reserves the right to identify additional defenses or claims, including, but not limited to those which become apparent from further investigation and discovery.

## AMENDED COUNTERCLAIM – JURY DEMAND REQUESTED

Defendant and Counter Plaintiff Smucker Services Company ("Smucker"), for its Amended Counterclaim against Plaintiff and Counter Defendant Tradeshift, Inc. ("Tradeshift"), states as follows:

## NATURE OF THE CASE

1.      Smucker brings this counterclaim to recover the significant damages it incurred as a result of Tradeshift's fraudulent inducement concerning its capabilities to perform under a services agreement dated June 30, 2019 ("Services Agreement" or "Agreement"), as well as Tradeshift's breaches of contract.[1]

2.      Smucker is a household name synonymous with the consumer-packaged goods that it and a network of suppliers make available across the nation. Given the number of suppliers, brands, and volume of products it provides, Smucker requires a comprehensive and attuned software system to manage its supply chain.

3.      In 2019, Smucker began a rigorous search for a vendor that could provide operating systems and applications for its supply chain's procure-to-pay process. As part of the search, Smucker asked contending vendors to answer over 200 questions in response to a formal Request for Proposal ("RFP"), complete an extensive report addressing hundreds of unique business criteria and capabilities (the "Business Requirements Document" or "BRD"), and agree to meet in-person.

4.      In response to Smucker's requests, Tradeshift submitted information about its business, capabilities, financial health, and experience that was replete with material misrepresentations. Among other things, Tradeshift fraudulently represented that it was uniquely

---

[1] As the Agreement is marked "Confidential" it is not attached but can be provided to the Court for an *in camera* review.

qualified and able to satisfy hundreds of unique criteria listed in the RFP and BRD, in an effort to fraudulently induce Smucker into selecting Tradeshift as its vendor.

5.      Smucker, relying on Tradeshift's submissions and without knowledge of the material misrepresentations contained therein, selected Tradeshift over other companies to serve as its vendor and, on June 30, 2019, the parties subsequently entered into the Services Agreement.

6.      If Smucker had known that Tradeshift materially misrepresented its ability to meet Smucker's stringent business requirements and its experience providing services to companies of similar size and scope, among other things, Smucker would not have selected Tradeshift as its vendor or entered into the Services Agreement.

7.      As a direct result of Tradeshift's misrepresentations, Smucker spent months trying to launch a product that Tradeshift knew from the beginning could not and would not meet Smucker's requirements, was forced to extend its contract with the existing software vendor to perform those services, and hire a new vendor at additional cost and expense, separate from and in addition to the hundreds of thousands of dollars it paid Tradeshift under the Services Agreement.

8.      After the parties entered into the Services Agreement, Smucker also discovered that Tradeshift could not provide the services it contractually agreed to perform. Had Smucker permitted Tradeshift to launch its program as Smucker's enterprise procure-to-pay solution, it would have been riddled with critical and fatal defects, which would have undoubtedly caused significant delays, inaccurate financial reporting, and disrupted communications with and payments from Smucker's suppliers.

9.      Tradeshift was incapable of satisfying Smucker's exacting requirements, let alone the most basic ones, and Tradeshift knew or reasonably should have known that it could not perform. In fact, Smucker had to move certain requirements from Tradeshift to BuyerQuest in an attempt to keep the project on schedule.

10.     As a direct result of Tradeshift's fraud and breaches of contract, Smucker has been damaged, and through this action, seeks rescission of the Services Agreement, as well as compensatory damages, punitive damages, and the other relief requested herein.

## THE PARTIES

11.      Smucker is an Ohio corporation with its principal place of business at One Strawberry Lane, Orrville, Ohio 44667.

12.     Smucker is an iconic one hundred twenty-four year old American company that manufactures and sells scores of consumable products like jam, peanut butter, jelly, fruit syrups, beverages, shortening, ice cream toppings, cooking oils, coffee, and pet food, among other products.

13.     Tradeshift is a Delaware corporation with its principal place of business at 612 Howard Street, Suite 100, San Francisco, California 94105.

14.     Tradeshift was founded in 2010 in Copenhagen, Denmark by Christian Lanng, Mikkel Hippe Brun, and Gert Sylvest.

15.     Tradeshift has offices in Denmark, the United Kingdom, China, Belgium, Japan, Germany, Australia, Romania, Malaysia, and France. Tradeshift also has one U.S.-based office in San Francisco, California.

16.     Tradeshift represents itself as a provider of a cloud-based network and platform that assists companies in digitizing the supply chain process.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

18.     Venue is proper in this Court pursuant to Section 14 of the Services Agreement in which the parties agreed to the Southern District of New York as the exclusive venue for purposes of disputes pursuant to the Agreement.

## FACTS AS TO FRAUD

### SMUCKER CONDUCTED DUE DILIGENCE IN SEARCH OF VENDORS THAT COULD MEET ITS EXACTING AND ABSOLUTE BUSINESS REQUIREMENTS

19.     In early 2019, Smucker began the process of selecting a vendor that could electronically manage its supply chain, which includes managing master data, creating and revising purchase requisitions and purchase orders ("PO"), entering goods receipts, and processing and reconciling invoices and payments, among other requirements.

20.     Smucker does not have the capability to create and provide such a system for itself, so it instead must rely on a third-party vendor to do so.

21.     Smucker was specifically looking for a vendor to provide an operating system and application that would allow it to perform these functions electronically, while simultaneously limiting manual intervention and handling of electronic data throughout the procure-to-pay process.

22.     Smucker deals with hundreds of suppliers on a daily basis for the different facets of its business and requires a robust operating system and program tailored to meet its unique business needs.

23.     As such, Smucker engaged in a rigorous vendor selection process to find a company that could provide the services it sought. It met with several vendors and required each to complete a written RFP, and, if selected, an extensive BRD.

24.     The RFP alone requested answers to over 200 questions regarding each prospective vendor's business and capabilities.

25.     In the BRD, Smucker sought detailed information about hundreds of requirements, which it categorized as either "Want" or "Must Have." The BRD included over 180 "Must Have" requirements that Smucker needed the ultimate vendor to be able to perform in order for the system to ultimately work as needed.

26.     The BRD explained that a vendor's failure to deliver a "Must Have" requirement would result in complete project failure.

### TRADESHIFT MATERIALLY MISREPRESENTED ITS CAPABILITIES

27.     Tradeshift is one of several vendors that participated in Smucker's selection process, which included several in-person meetings, a demonstration, and completing the RFP and BRD.

28.     Tradeshift was founded in Copenhagen and at the time, the vast majority of its customers are based outside of the United States.

29.     Tradeshift saw the Smucker opportunity as a way to grow its presence in the United States by adding a flagship client to its books, which would allow it to use the relationship to court similar U.S.-based companies.

30.     To accomplish this, Tradeshift made a number of material misrepresentations and self-serving assurances to Smucker regarding its qualifications and capabilities to ensure that it would be selected as Smucker's vendor.

> ### A.   *Tradeshift knowingly and with explicit intent made material misrepresentations in its responses to Smucker's Request for Proposals (RFP).*

31.     In its March 2, 2019 response to the RFP[2], Tradeshift answered hundreds of questions regarding its business and product functionality which addressed, among other topics:

---

[2] Given the voluminous nature of the RFP, as well as the confidentiality of the submission, it is not attached but can be provided to the Court for an *in camera* review.

catalog management, configuration, user interface, guided buying, purchase orders (including purchase order setup and collaboration), budgeting, receiving, invoicing, supplier information, system security and technology, general architecture, integration, error handling, data security, support, and implementation.

32.     In preparing its response, however, Tradeshift recognized that if it answered accurately, it would have trouble providing the answers Smucker was looking for in the RFP.

33.     As early as February 1, 2019, Prem Vadlamudi (a Tradeshift employee who assisted in preparing the response to the RFP) doubted whether Tradeshift could provide the same capabilities as competitors to the Smucker project.

34.     Likewise, on February 26, 2019, Chris Todd, the Tradeshift Account Executive responsible for the Smucker relationship, admitted that Tradeshift was coming up short on some of its responses to the RFP.

35.     Nonetheless, Tradeshift submitted its individual response to the RFP on March 2, 2019.

36.     Tradeshift subsequently teamed up with BuyerQuest to pitch a joint solution in an attempt to mitigate Tradeshift's individual shortcomings, but Tradeshift's responses in the joint submission remained unchanged. Tradeshift and BuyerQuest submitted the joint RFP containing their combined responses to Smucker on March 11, 2019.

### i.     Tradeshift misrepresented its business and financials.

37.     Tradeshift's individual RFP response and its joint RFP response with BuyerQuest contain misrepresentations about its business and financial condition.

38.     For example, Smucker asked Tradeshift how many P2P implementations it completed in the past 24 months for companies of similar size *and* complexity to Smucker.

39.     Tradeshift represented that, based on the size *and* complexity of Smucker, it had completed over 20 similar implementations in the past 24 months.

40.     Behind the scenes, however, Tradeshift discussed ways to avoid answering the question because it knew the company had likely completed fewer implementations over the past two years than its competitors.

41.     Wanting to secure the Smucker deal, however, on March 1, 2019, Tradeshift employees discussed ways to respond to the question to avoid committing to a number.

42.     Even the "over 20" figure that Tradeshift ultimately provided was false.

43.     Smucker later determined that, at the time, Tradeshift only had a limited number of customers paying Tradeshift a similar value, and that it had very limited experience working with companies that even neared Smucker's size or revenue.

44.     The RFP also asked Tradeshift to disclose its revenue from the previous fiscal year.

45.     Tradeshift indicated its revenue was between "$300-$500 million."

46.     In actuality, Tradeshift's fiscal year 2018 revenue was much less.

47.     Tradeshift misrepresented its 2018 revenue because, it believed, the true amount would scare and deter Smucker from selecting Tradeshift as its vendor.

48.     Tradeshift was particularly aware that its low revenue may also scare its other customers and employees into potentially leaving the company.

### ii.     Tradeshift misrepresented its technical capabilities.

49.     Tradeshift also included many representations about how its product was superior to that of its competitors, touting its ability to onboard suppliers for electronic invoicing, and a myriad of other options that were solely available on the Tradeshift platform.

50.     In response to each question about whether Tradeshift's software had certain capabilities, with minimal exceptions its answers were unequivocally "Yes."

51.     In part, Tradeshift made technical misrepresentations in response to RFP Sections 7.1, 4.1.5, 8.5, 4.1.8, 10.2.20, 4.1.1, and 10.4.5.

52.     Tradeshift further affirmed in its RFP responses that its programs could, *at that time*, perform the tasks that Smucker required.

53.     Tradeshift's responses to the above RFP sections were false because Tradeshift could not perform those capabilities, including, but not limited to providing: advanced shipment notices, supplier site capabilities, multiple purchase order contacts, real-time supplier master data integration, Oracle integrations, cXML capabilities, and configurable invoice entries.

54.     Tradeshift knew that its product was not the right fit, yet it represented to Smucker that it already had these and other technical capabilities to deceive Smucker into selecting Tradeshift.

55.     On April 10, 2019, Mr. Rahill acknowledged as much, stating Tradeshift's responses to the RFP about its product functionality likely crossed the line into fallacy.

56.     Yet, Smucker did not know about these internal conversations during the evaluation process and was instead forced to rely on Tradeshift's RFP responses and take them as true.

### B. Tradeshift made material misrepresentations in its response to Smucker's Business Requirements Document (BRD).

57.     Based on Tradeshift's response to the RFP, Smucker selected Tradeshift to participate as a final vendor in the selection process, which required Tradeshift to complete the BRD.

58.     Before Tradeshift even submitted its response to the BRD, it knew it could not meet basic requirements.

59.     On April 17, 2019, Mr. Shah foreshadowed Tradeshift's mounting issues to meet Smucker's requirements, wishing that Tradeshift and BuyerQuest had first tested integrating their systems for a smaller, less complex client before attempting to do so for Smucker.

60.     Yet, by June 14, 2019, Mr. Todd submitted a completed BRD that expressly represented Tradeshift could fulfill most, if not all, of Smucker's "Want" and "Must Have" requirements.[3]

61.     The scope of the representations is voluminous, and, as a result, they are not repeated in this Amended Complaint, but are contained in the BRD itself.

62.     There were roughly 250 requirements on the BRD, over 180 of which were listed by Smucker as "Must Have" requirements.

63.     In other words, without these features the system would not work for Smucker.

64.     Tradeshift not only represented that it could meet these requirements, but that the majority were available "out of the box," meaning the features did not require significant configuration.

65.     Tradeshift represented that its product was—at the time it submitted the BRD— already designed to meet and capable of satisfying Smucker's "Want" and "Must Have" requirements.

66.     By way of representative examples, Tradeshift's representations that it had the following capabilities out of the box were false:

      a.   "Ability to prohibit supplier updates within the P2P System." Tradeshift's affirmative response was a misrepresentation because supplier data did not integrate with Oracle.

---

[3] Again, given the voluminous nature of the BRD, as well as the confidentiality of the submission, it is not attached but can be provided to the Court for an *in camera* review

b. "Ability to integrate supplier master changes from Oracle to Tradeshift (including mergers)." Tradeshift's affirmative response was a misrepresentation because updates in Oracle would not integrate with Tradeshift's platform.

c. "Ability for supplier to provide comments on PO acknowledgement." Tradeshift's affirmative response was a misrepresentation because suppliers did not have the ability to make Purchase Order acknowledgements.

d. "Ability for suppliers to send Advance Shipment Notices (ASNs)." Tradeshift's affirmative response was a misrepresentation because suppliers did not have the capability to complete ASNs.

e. "Ability to have 1 to many supplier site relationships." Tradeshift's affirmative response was a misrepresentation because Tradeshift's system did not have the capability to connect one supplier to multiple supplier sites (locations).

f. "Ability for each supplier site to have 3 or more contacts." Tradeshift's affirmative response was a misrepresentation because Tradeshift allowed only one PO communication contact.

g. "Ability for a user to 'hide' the overall PO value on a PO communication to the supplier." Tradeshift's affirmative response was a misrepresentation because it was not a capability Tradeshift could provide.

h. "Ability to integrate Supplier master data from Oracle EBS in an automated manner . . . ." Tradeshift's affirmative response was a misrepresentation because supplier creations only integrated with Tradeshift. Any updates in Oracle could not integrate with the Tradeshift system.

15

    i.   "Ability for Third Party Systems to submit invoices via EDI, CXML, CSV." Tradeshift's affirmative response was a misrepresentation because cXML was not a capability Tradeshift could provide.

    j.   "Ability to setup various approval routing rules (at entry of invoice)." Tradeshift's affirmative response was a misrepresentation because invoice entry could only be accomplished through optical character recognition.

    k.   "Ability to setup reconciliation routing rules (Non PO approvals, 2 way approval, 3 way match)." Tradeshift's affirmative response was a misrepresentation because there was no two-way match solution.

    l.   "Ability to customize invoice entry form." Tradeshift's affirmative response was a misrepresentation because invoice entry could only be through optical character recognition.

    m.   "Ability for all master data to be real-time." Tradeshift's affirmative response was a misrepresentation because supplier master data took over 24 hours to integrate and included a manual process that had to be completed on the Tradeshift side.

    n.   "Ability to enter a credit memo for returns." Tradeshift's affirmative response was a misrepresentation because it was not a capability Tradeshift could provide.

67.    Behind the scenes, however, the Tradeshift team knew they did not have the capabilities that Smucker required.

68.    Tradeshift knew that Smucker wanted assurances about the requirements, but misrepresented its capabilities to avoid jeopardizing the Services Agreement and Statement of Work.

69.    On June 13, 2019, for example, Mr. Vadlamudi and Mr. Shah admitted that Tradeshift would struggle to provide goods receipt requirements to Smucker.

70.     Despite raising these concerns, Mr. Shah instructed Mr. Vadlamudi to mirror what Tradeshift disclosed in the RFP response, because although the RFP response was also a misstatement, at least the BRD would contain a consistent misstatement.

71.     Tradeshift's true struggles to meet Smucker's requirements extended well beyond goods receipts. In mid-June 2019, another Tradeshift employee, Lauren Pisciotta, internally admitted that the Smucker project required more capabilities than any other Tradeshift customer, anticipated problems, and doubted whether Tradeshift could provide the requirements in the way Smucker requested, if at all.

### C.   *Tradeshift made additional pre-contractual misrepresentations outside of the RFP and BRD.*

72.     Beyond the RFP and BRD, Tradeshift made numerous other misrepresentations to Smucker to win the deal.

73.     Tradeshift misrepresented the extent of its working relationship with BuyerQuest to induce Smucker into selecting the pair as a joint solution.

74.     Tradeshift's Mr. Roehrs understood that Smucker would likely not select Tradeshift as its vendor if it looked like Tradeshift and BuyerQuest met in the parking lot before a meeting at Smucker headquarters.

75.     Mr. Roehrs was right. Smucker asked questions to understand the relationship between Tradeshift and BuyerQuest. In particular, Smucker asked Tradeshift how many customers Tradeshift and BuyerQuest have shared.

76.     On March 13, 2019, Tradeshift's Mr. Todd and Mr. Rahill internally discussed how to stretch the answer to make the joint bid more enticing.

77.     Mr. McCusker of Tradeshift also knew that Smucker wanted a secure partnership between Tradeshift and BuyerQuest and advised his team to get creative on how to convince Smucker that the partnership was real.

78.     Soon after, Tradeshift misrepresented to Smucker and the public through an April 4, 2019 press release on Business Wire that integrations between BuyerQuest and Tradeshift were "seamless[]," despite the integrations remaining incomplete.

79.     Then, on April 10, 2019, Tradeshift employees Mr. Todd, Mr. Rahill, and Mr. Roehrs discussed the intent and inaccuracy of the press release.

80.     Mr. Todd admitted the press release made it seem that the integrations between Tradeshift and BuyerQuest were already complete when in fact they were not, but advised his team to continue operating under that false narrative to deceive Smucker.

81.     Yet, *as of August 4, 2019*, the Tradeshift team had *not even started* to build the BuyerQuest integrations. According to Tradeshift's Ms. Pisciotta, the integration had slipped through the cracks altogether.

82.     On April 27, 2019, Tradeshift also represented that it would commit to a local presence in Northeast Ohio, including weekly, monthly, or quarterly meetings with Smucker's executive team and that it would station a dedicated Tradeshift team at BuyerQuest's Cleveland office.

83.     Tradeshift repeated this representation in informational documents and emails to Smucker.

84.     On May 23, 2019, however, Ms. Pisciotta made clear to a colleague that Tradeshift would not commit to having a local resource in Northeast Ohio.

85.     Ms. Pisciotta's decision was never communicated to Smucker, and the lack of a Tradeshift representative on site at Smucker or stationed in BuyerQuest headquarters became a problem within a month of Tradeshift beginning work on the Smucker project.

### TRADESHIFT'S FRAUD VOIDED THE AGREEMENT

86.     Based on the above misrepresentations, Smucker selected Tradeshift as its vendor and executed the Services Agreement on June 30, 2019.

87.     Between July 2019 and December 2019, it became apparent that Tradeshift had materially misrepresented the capabilities and functionality of its product, health and profitability of its business, and its relationship with BuyerQuest, among others.

88.     Had Tradeshift accurately represented the true limitations of its system capabilities, Smucker would never have entered into the Services Agreement.

### SMUCKER INCURRED SIGNIFICANT NON-CONTRACT DAMAGES

89.     As a result of Tradeshift's material misrepresentations and fraud, Smucker incurred and continues to incur significant damages.

90.     Because Smucker needed a software to keep its billion dollar supply chain running, Smucker paid its previous software provider approximately $400,000 to extend its service while the new vendor built its product.

91.     Smucker was also forced to incur hundreds of thousands of dollars to replace Tradeshift and to integrate a new product into Smucker's system.

### <u>FACTS AS TO BREACH OF CONTRACT</u>

92.     On June 30, 2019, Smucker and Tradeshift executed the Services Agreement.

93.     The Services Agreement contained a general Statement of Work for the project.

94.     Mr. Shah was the individual at Tradeshift responsible for the drafting of the Statement of Work.

95.     In negotiating the Statement of Work, Smucker was very concerned with its objectives being met. In June 2019, Tradeshift met with Smucker to discuss the Statement of Work.

96.     During that meeting, Smucker relied on Tradeshift to understand what its product was capable of doing and whether it could meet Smucker's requirements. There were certain functionalities, like the manual input of an invoice feature, among many others, that Smucker needed on day one in order to meet the go-live deadline.

97.     In addition to the Statement of Work, Tradeshift also created a document tilted the "Solution Description Document" to further describe the scope of the Smucker project in more detail.

98.     The Solution Description Document supplemented the requirements in the Statement of Work.

99.     In addition to the technical requirements in the Statement of Work, there were other expectations required by the Services Agreement. For example, Section 9 required Tradeshift to carry a Commercial General Liability Insurance Policy with an umbrella coverage of $5,000,000, including coverage for the obligations assumed under the Smucker engagement.

100.     Section 6 prohibited Tradeshift from using the Smucker name, logo, trademark, or any reference either direct or indirect of Smucker in publicity releases without the prior written consent. This was repeated on page 19 of the Services Agreement.

## THE PROJECT FAILED AS A RESULT OF NUMEROUS CRITICAL AND FATAL DEFECTS

101.     Shortly after the parties entered into the Services Agreement, the project experienced significant delays.

102.     The issues were so numerous that Smucker was forced to review with and/or provide a defects list to Tradeshift on a weekly, if not daily, basis.

103.    Early on in the project, certain requirements were transferred from Tradeshift to BuyerQuest in an attempt to keep the project on schedule.

104.     In addition, it became necessary for the Smucker and Tradeshift project team to speak daily and project manage weekly, in an attempt to address the untold number of problems and issues that consistently arose with the project.

105.    Internal emails show that by mid-December, Tradeshift was well aware Smucker was concerned and had grown frustrated because the defects were causing a standstill of testing.

106.    Among the list of defects identified by Smucker were items that were either "fatal" or "critical" in nature, terms that were defined at the start of testing.

107.    Smucker defined "critical defect" as "one that prevents the application from functioning and will delay go-live. This is a major flaw in the design that inhibits a 'Must Have' business requirement from being met and has no workaround."

108.    Smucker defined "fatal defect" as a defect that "causes system level errors that prevent the test execution from continuing.  For example, clicking on the 'Submit' button causes the application to crash.  Fatal defects must be fixed immediately, so testing can continue."

109.    In January 2020, the Tradeshift product still suffered from multiple critical and fatal defects including, but not limited to, the inability to: create credit memos from invoices, add line level delivery information on credit memos, stop a purchase order for review before external validation, create purchase order PDF capability, process a quantity-ordered hold only when over the ordered amount, receipt reference to the original purchase order (and not the change order), and integrate with Oracle.

110.    When confronted with the critical and/or fatal defects in its program, Tradeshift responded it either could not meet the requirement or that it would consider an upgrade in the future.

111.     Smucker soon realized that Tradeshift's program did not have the basic functionality needed to meet critical requirements and/or cure critical and/or fatal defects.

112.     Smucker informed Tradeshift about of each of the defects, but after weeks of opportunity and attempts to cure, Tradeshift could not provide a timely solution.

113.     As late as January 6, 2020, the program still had several defects, some of which were critical, and others fatal.

114.     Tradeshift's software did not even meet Smucker's basic functionality requirements—let alone the specific and more complex ones—and Tradeshift was unable to perform its obligations under the Services Agreement.

## SMUCKER TERMINATED THE SERVICES AGREEMENT AND INCURRED SIGNIFICANT DAMAGES

115.     Tradeshift's failure to provide the service and deliverables contracted for in the Service Agreement amounted to a material breach.

116.     Smucker provided Tradeshift with constructive notice of the defects, which allowed Tradeshift the chance to cure each breach.

117.     Tradeshift did not cure its defects within a reasonable time, and Smucker terminated the Services Agreement on January 16, 2020.

118.     As a result of Tradeshift's breach, Smucker incurred and continues to incur significant, separate contract damages.

119.     Smucker is entitled to recover all damages permissible under the Services Agreement.

## COUNT I
## FRAUDULENT INDUCEMENT

120.     Counter Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

121. As set forth in the above samples, Tradeshift misrepresented material facts about its capabilities and the functionality of the product it could deliver to Smucker in responding to Smucker's RFP and BRD, as well as in conversations with Smucker during the vendor selection process.

122. In the RFP that Tradeshift sent Smucker on March 2, 2019, Tradeshift's misrepresentations were numerous, including, but not limited to, the financial stability of Tradeshift, its experience with similar companies and projects, its superiority to competitor products, and the functionality of its software including that its system provided real-time integration with Oracle and could "hide" the overall value of a PO.

123. In the BRD that Tradeshift sent Smucker on June 14, 2019, Tradeshift's misrepresentations were also numerous, including, but not limited to: (1) the ability to have one to many supplier site relationships; (2) the ability for a user to 'hide' the overall PO value on a PO communication to the supplier, (3) the ability to integrate supplier master data from Oracle in an automated manner; (4) the ability to setup various approval routing rules (at entry of invoice); (5) the ability to setup reconciliation routing rules; (6) the ability to customize the entry form; (7) the ability for all master data to be real-time; and (8) the ability to enter a credit memo for returns.

124. If Tradeshift had responded truthfully and with full and complete disclosures, including the limitations of its product's capabilities, Tradeshift's submission to the BRD would have revealed that it was incapable of meeting many of Smucker's "Want" and "Must Have" requirements.

125. Smucker did not know or have reason to know that Tradeshift's submissions in the RFP and BRD contained material misrepresentations, but instead had to rely on Tradeshift's responses.

126.   Tradeshift knew or should have known that many of its pre-contractual statements were false, misleading, and/or incomplete, or it knew or should have known that it was misrepresenting information that was material to Smucker.

127.   Tradeshift had knowledge or access to facts regarding its revenue, experience with BuyerQuest, technical capabilities, and experience with customers similar to Smucker that contradict the truth and now show that Tradeshift's representations to Smucker were false.

128.   Tradeshift acted with recklessness and conscious misbehavior when it came to the truth of its statements.

129.   It made material misrepresentations to add Smucker as a client and use that relationship to expand its U.S. customer base.

130.   Tradeshift intended for Smucker to rely upon its pre-contractual representations and Smucker reasonably relied on the same.

131.   Smucker was injured because, but for Tradeshift's false and misleading representations, Smucker would not have selected Tradeshift as its vendor or entered into the Services Agreement.

132.   Smucker is entitled to rescission of the Services Agreement and compensatory damages, including pre-judgment interest.

133.    Smucker is also entitled to punitive damages in an amount sufficient to punish and deter Tradeshift from engaging in similar wanton behavior in the future. Tradeshift's representations regarding its integration with BuyerQuest and financial condition were the subject of press releases, expanding Tradeshift's scheme to convince the greater public that it has integrations capabilities and financial stability well beyond its experience.

134.   Tradeshift also struggled to meet the technical requirements of other customers. Its employees stated that at least one other Tradeshift implementation was on the brink of a lawsuit.

135.    In addition, Tradeshift employees doubted the capabilities and experience of its U.S.-based employees on several project implementations, including Smucker. On October 1, 2019, Mr. Rahill further stated that Tradeshift faltered on 100% of its past implementations in North America.

136.    Tradeshift has a pattern and practice of over-promising and under-delivering that has harmed Smucker and its other customers and threatens to harm future Tradeshift customers.

137.    Such behavior should be punished with punitive damages to deter Tradeshift from repeating this conduct.

## COUNT II
## BREACH OF CONTRACT

138.    Counter Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

139.    Tradeshift breached Section 6 and the Company Commitments of the Services Agreement by using Smucker's name without written permission in an interview between SpendMatters and Tradeshift CEO Christian Lanng on January 14, 2020.[4]

140.    Tradeshift breached Section 9 of the Services Agreement by failing to maintain a General Commercial Liability Policy.

141.    Tradeshift breached the Services Agreement, and the Statement of Work incorporated therein, by failing to provide the services and product functionality that it was contractually obligated to provide. Tradeshift did not and could not provide the following non-exhaustive list of functionalities: the ability to create credit memos from invoices, add line level delivery information on credit memos, stop a purchase order for review before external validation,

---

[4] https://spendmatters.com/2020/01/14/tradeshift-has-240-million-funding-round-plans-to-restructure-and-focus-on-near-term-profitability/

create purchase order PDF capability, process a quantity-ordered hold only when over the ordered amount, receipt reference to the original purchase order (and not the change order), and integration with Oracle.

142.    For all the reasons stated above, Tradeshift committed a material breach of the Services Agreement that cannot be remedied.

143.    Smucker is entitled to damages in accordance to the terms of the Services Agreement, including pre-judgment interest.

## PRAYER FOR RELIEF

Counter Plaintiff Smucker Services Company prays for judgment in its favor and against Tradeshift, Inc. for damages for fraudulent inducement and breach of contract, pre- and post-judgment interest, punitive damages, costs, and such further relief to which Counter Plaintiff may be entitled.

## JURY DEMAND

Counter Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ *Chelsea R. Mikula*
Chelsea R. Mikula (admitted *pro hac vice*)
Ronie M. Schmelz
Savannah M. Fox (admitted *pro hac vice*)
**TUCKER ELLIS LLP**
950 Main Avenue
Suite 1100
Cleveland, OH 44113
Telephone:    216.592.5000
Facsimile:    216.592.5009
E-mail: chelsea.mikula@tuckerellis.com
          ronie.schmelz@tuckerellis.com
          savannah.fox@tuckerellis.com

*Attorneys for Defendant and Counter Plaintiff*
*Smucker Services Company*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2021, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ *Chelsea R. Mikula*
Chelsea R. Mikula

*One of the Attorneys for Defendant and*
*Counter Plaintiff Smucker Services Company*